1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9

CHERYL LESLIE,                                  )          **Case No. CV 13-7056 GAF (RZx)**
                                                )
10                     Plaintiff,               )
                                                )
11                                              )
                                                )          MEMORANDUM & ORDER
12            v.                                )          REGARDING BENCH TRIAL
                                                )
13                                              )
       UNITED OF OMAHA LIFE                     )
14     INSURANCE COMPANY; and DOES              )
       1 through 10, inclusive,                 )
15                                              )
                       Defendants.              )
16                                              )
                                                )
17                                              )
       ─────────────────────────────           )

18

19                                         **I.**

20                                  **INTRODUCTION**

21          In September 2011, Plaintiff Cheryl Leslie ("Plaintiff" or "Leslie") began

22   working at Covenant House California ("CHC"), a homeless shelter, as an

23   Administrative Service Coordinator (Purchasing/Finance).  Between her first and final

24   day of work on June 28, 2012, Leslie was placed "off work" six times via multiple

25   doctors' Work Status Reports for varying diagnoses and reasons.

26          Leslie thereafter submitted a claim to her Long Term Disability ("LTD")

27   insurer, defendant United of Omaha Insurance Company ("United"), which also

28   administered the LTD Plan.  United denied the claim and this lawsuit followed.

1    Because Leslie's claim was initially based on her severe clinical depression,

2    which both parties acknowledge pre-dated coverage under the LTD Plan, United denied

3    the claim because the policy excludes from coverage disabilities arising from pre-

4    existing conditions.  That decision is not at issue in this case.  Rather, after the first

5    denial, Leslie asked United to review her claim based on revised medical reports

6    indicating that Fibromyalgia and not clinical depression was her primary and disabling

7    condition.  United considered the new information but reiterated its denial of Leslie's

8    LTD claim on the ground that her Fibromyalgia did not render her Totally Disabled

9    from her Occupation under the terms of the LTD Plan.

10    In this lawsuit, Leslie contends that United should grant her LTD benefits

11    because United used the wrong Usual Occupation (hereinafter "Occupation") when

12    evaluating whether she was Totally Disabled and that her Fibromyalgia has Totally

13    Disabled her from performing her actual Occupation.  (Docket No. 21 [Plaintiff

14    Opening Mem. ("Plaintiff Mem.")].)  United responds that it acted properly in denying

15    Leslie LTD benefits because it was correct in its characterization of Leslie's

16    Occupation, Leslie is not totally disabled by Fibromyalgia from that Occupation, and

17    that even if she was, such disability would not be covered under the LTD Plan because

18    it was rooted in a pre-existing condition and is thus excluded under the LTD Plan.

19    (Docket No. 22 [United's Opening Mem. ("United Mem.")].)[1]

20    The matter came for trial on the administrative record on September 30, 2014.

21    Plaintiff asserts and United does not object that the Court should evaluate the plan

22    administrator's disability findings under a *de novo* standard of review.  Having

23    considered the evidence in the administrative record, the briefing of the parties, and the

24    arguments presented at trial, the Court finds for United.  The Court concludes that

25

26    _____

27    [1]The issue of whether fibromyalgia was a pre-existing condition was not mentioned in United's denial of
Leslie's appeal.  However, because the parties debate it in their memoranda, the Court will briefly address
the question at the end of this order.

28

United used the proper Occupation in its analysis and that Leslie is not Totally Disabled from performing the substantial and material duties of that occupation.

## II.

## BACKGROUND

In September 2011, Plaintiff Cheryl Leslie ("Plaintiff" or "Leslie") began working at CHC, a homeless shelter, as an Administrative Service Coordinator with duties in purchasing and finance.  (Docket No. 24 [Declaration of Molly Juehl] at Docket No. 26, Ex.A [Administrative Record ("AR" at 63, 611)]; see also, id. at 260.)  During her time as an employee of CHC, Leslie was insured under a Group-Long Term Disability Insurance Policy ("Plan") number GLTD-0A16X through United.  (Id. at 1, 14, 63.)

Leslie's final day of work at CHC was June 28, 2012.  (See id. at 66, 101.)  She claimed that she had become disabled and later submitted a Long Term Disability ("LTD") Claim around the end of September or beginning of October.  (Id. at 606.)[2] Her claim was denied.  In this suit she contends that she is both (a) disabled from her Occupation and (b) by a condition which was not pre-existing.

**A. PLAINTIFF'S OCCUPATION**

Despite her job title, which suggests that Leslie's position as Administrative Services Coordinator is essentially a sedentary administrative position, what her Occupation actually requires is a subject of dispute in this case.  (Id. at 63, 611.)

In her initial LTD Application, Leslie described her job duties at CHC as "[p]urchas[ing] all items for LA & Oakland facilities, oversee maintenance & janitorial staff in LA."  (Id. at 608.)  She listed the physical requirements of her job at CHC as "[w]alking, climbing stairs, [and] lifting boxes."  (Id.)

---

[2] From March through October 2012, Leslie was ordered off work six times by physicians for various reasons including her anxiety and her Fibromyalgia.  (See id. at 570.)  Dr. McIntosh was the physician placing Leslie off work three times.  (See id.)  Twice Fibromyalgia was listed as the sole diagnosis on the work status report ordering Leslie off work.  (See id. at 622, 624.)

In the "Employer's Statement" portion of the initial LTD Claim, John Garcia, Director of Human Resources at CHC, indicated that Leslie's job involved "continuous (67%-100%)" use of a computer, relating to others, written and verbal communication, and walking; "frequent (34%-66%)" use of reasoning, math and language skills; between "frequent (34%-66%)" and "occasionally (0%-33%)" standing; and "occasionally (0%-33%)" making independent judgments, stooping, climbing one flight of stairs, and lifting/carrying. (Id. at 612-613.) Regarding activities involving lifting, carrying, pushing or pulling, Mr. Garcia indicated Leslie's job involved "[r]eceiving purchased goods 40-50 pounds (on oc.–not off. [sic])" (Id. at 613.) Mr. Garcia also attached a two page-long description of job duties and requirements for Leslie's position, including a requirement that an applicant "[m]ust be able to lift up to 40-50 lbs. on occasion, bend, sit and stand for prolonged periods of time." (Id. at 614-15.)

United had a vocational consultant prepare an Occupational Analysis ("OA") as part of a vocational file review for Leslie. (Id. at 114-16.) In preparing the OA, the consultant reviewed the referral document from the United claims worker assigned to Leslie's case, the Employer's statement with Job Analysis section of the LTD Claim, and the Job description of Administrative Services Coordinator (Purchasing & Facilities). (Id. at 114.) Additionally, the consultant used "standard vocational resources including: The Dictionary of Occupational Titles (DOT), U.S. Department of Labor Employment and Training Administration, Fourth Edition, revised, 1991; [sic] Occupational Information Network (O*Net), and the Classification of Jobs, 2000, Elliot and Fitzpatrick, 1999." (Id.)

Based on those sources of information, United's vocational consultant's analysis concluded that the position of an Administrative Services Coordinator involves administrative service functions such as the "administration of purchasing activities, preparing purchase orders, monitoring vendor contracts, managing the facilities budget, ordering and organizing general office supplies, stocking and withdrawals, overseeing the general maintenance workers and housekeeping crew." (Id. at 114-15.) United

claims Leslie's position would use the DOT Code of Building Supervisor, who generally falls within the Light exertion level, requiring "exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount force constantly to move objects." (Id. at 115.) United did address the alleged 40-50 pounds alleged in the Job Description provided by CHC, noting that this was "on an occasional basis and not often" and would cause the job to "fall within the light to medium work category." (Id. at 116.) Additionally, it stated that "[a]lthough the position was entitled administrative in nature, the tasks involved facilities coordination with frequent to constant standing and walking and occasional climbing of ladders.[3]" (Id.)

**B. PLAINTIFF'S MEDICAL HISTORY**

Before her employment at CHC, Leslie had been treated by numerous doctors over the course of her lifetime. A victim of child abuse, Leslie has suffered from depression since a young age and has received treatment and medication for depression since at least May 2011. (Id. at 196, 276; see also, id. at 133 (noting Leslie was on depression medication since April 2011).)

In 2011, Leslie had appointments with the Family Medicine Associates of Northridge ("FMAN"). (Id. at 586-88.) During this time, Leslie was treated and prescribed medication for depression. (Id. at 276, 277.) Leslie complained of shoulder and upper back pain at her August 11, 2011, appointment, but no diagnosis regarding such pain was indicated. (See id. at 587.)

In 2012, she began seeing doctors at Kaiser. (See id. at 131.) On January 16, 2012, she first saw Dr. Roraldo at Kaiser for a physical exam. (Id. at 133.) During her check-up Dr. Roraldo noted Leslie's history of depression, pain in her neck, and pain in her shoulder blades. (Id.) Leslie stated her shoulder pain had occurred since she had

---

[3]Nowhere on the Job Description is the climbing of ladders, occasional or otherwise, mentioned or denoted. (Id. at 613-615.) Instead, the form indicates that the job occasionally requires climbing one flight of stairs. (Id. at 613.)

1  been in a motor vehicle accident in June 2011 and that the pain worsened "with

2  overhead reaching." (Id.) She had been referred to physical therapy, but had lost her

3  insurance. (Id.) During Leslie's follow up visit with Dr. Roraldo on April 20, 2012 Dr.

4  Roraldo started her on Gabapentin.[4] (Id. at 166.) When Leslie saw Dr. Roraldo again

5  on May 29, 2012, she continued to complain of generalized body pains that had endured

6  for at least 8 years. (Id. at 174.) At that appointment Dr. Roraldo noted that Leslie had

7  Myalgia, possibly Fibromyalgia. (Id. at 175.)

8          In March 2012, Leslie began seeing Dr. McIntosh from Kaiser's Psychiatry

9  department. (See e.g., id. at 537.) On March 19, 2012, Dr. McIntosh evaluated Leslie,

10  noting her depression and that Leslie had "a lot of stress from the workplace." (Id.)

11  She also noted that "[s]ome days [Leslie] c[ould]n't get out of the bed and want[ed] to

12  be left alone.  2 days a week, [Leslie] has difficulty." (Id.) Additionally, Dr. McIntosh

13  noted Leslie was "chronically fatigued" and "unable to concentrate" or "focus." (Id.)

14  On March 29, 2012, Dr. McIntosh saw Leslie again but did not note any new

15  developments. (Id. at 540.) At a later appointment on May 30, 2012, Dr. McIntosh

16  entertained the possibility of Fibromyalgia being a possible cause of Leslie's pains.

17  (See id. at 544 (noting "? Diagnosis of fibromyalgia.").) However, Dr. McIntosh did

18  not include Fibromyalgia in her assessment, listing only Leslie's depression and

19  anxiety. (Id.)

20          Leslie saw another Kaiser doctor, Dr. Salehi, for a second opinion regarding her

21  potential Fibromyalgia on June 7, 2012. (Id. at 188.) He drew the same conclusion as

22  Dr. Roraldo and noted Leslie was "scheduled with rheumatology in 3 days." (Id. at

23  189.) On June 11, 2012, Leslie saw Dr. Tang from Kaiser's rheumatology department.

24  

25  [4]According to MedlinePlus, a service of the U.S. National Library of Medicine, Gabapentin is used "to
    help control certain types of seizures in people who have epilepsy . . . to relieve the pain of postherpetic
26  neuralgia [an after-effect of shingles] . . . [and] to treat restless legs syndrome . . . [but] is also sometimes
    user to relieve the pain of diabetic neuropathy . . . and to treat and prevent hot flashes . . . in women who
27  are being treated for breast cancer or who have experienced menopause." (U.S. National Library of
    Medicine National Institute of Health, Gabapentin, (last visited October 17, 2014),
28  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html.)

(Id. at 196-97.)  In Dr. Tang's patient history he noted Leslie's "depression [began] in her young age (< 10) and diffuse body pain (non-neuropathic) began in late teen (19)." (Id. at 196.)  Leslie's medical records reflect a first *diagnosis* of fibromyalgia during the June 11 appointment with Dr. Tang.  (Id. at 198.)  Dr. Tang started Leslie on Norco to treat her Fibromyalgia.  (Id. at 200; see also, id. at 206.)

Leslie saw Dr. McIntosh twice more, on June 22, 2012 and June 28, 2012.  (Id. at 546, 548.)  At these appointments, Leslie complained of pain.  (Id.)  At her July 17, 2012, appointment with Dr. McIntosh, Leslie complained of "an abundance of pain." (Id. at 550.)

Leslie sought a second opinion regarding her Fibromyalgia from a Kaiser doctor, Dr. Au, on July 20, 2012.  (Id. at 222.)  Dr. Au confirmed Dr. Tang's diagnosis. (Id.)  During that appointment Leslie stated that the Gabapentin helped her pain, but that "she still has bad days . . . . [and] complains mostly of fatigue . . . . [and] has significant difficulty getting up and around in the mornings."  (Id. at 222.)  Dr. Au's assessment and plan for treatment of her Fibromyalgia included an increase in her Gabapentin and her Effexor medications.  He also recommended improved sleep hygiene, exercising, and avoiding opiates.  Dr. Au considered switching to Cymbalta or Lyrica if Leslie continued to have significant pain or referring her to chronic pain management for cognitive behavioral therapy in the future.  (Id. at 224.)

Leslie saw Dr. McIntosh again on August 9, 2012.  (Id. at 552.)  At this appointment Leslie stated she was "in chronic pain."  (Id.)  Also, Dr. McIntosh first included Fibromyalgia in her assessment of Leslie.

Leslie later saw Dr. Ching, a Kaiser pain management specialist whom Dr. Roraldo had referred her to, on August 24, 2012.  (Id. at 230.)  After Leslie's physical examination, Dr. Ching noted that Leslie did not appear to be in any acute distress but assessed that Leslie had chronic neck, upper back, arm and leg pain.  (Id. at 232-33.) Dr. Ching emphasized that Fibromyalgia was "not a degenerative or malignant process" and that the "primary management of symptoms is low impact aerobic exercise, good

7

1  sleep hygiene, [and the] proper management of depression/anxiety/stress." (Id. at 233.)

2  Leslie received "[t]rigger point injections" of Lidocaine in her bilateral trapezius

3  muscles. (Id. at 234.)

4       Leslie tried to see Dr. McIntosh on September 26, 2012, however, she was

5  unable to do so because at that point she had lost her Kaiser insurance. (Id. at 554.) Dr.

6  McIntosh filled out paperwork Leslie requested.[5] (Id.)

7       Leslie went to FMAN for treatment on October 15, 2012. (Id. at 125.) There,

8  Dr. Gagneja[6] noted that Leslie was having sleeping problems and "need[ed]

9  Rheumatology or pain man[agement.]" (Id.) Leslie saw Dr. Chung of the Facey

10 Medical Group ("Facey"), a rheumatologist, on October 22, 2012 for a "consultation

11 relating to fibromyalgia." (Id. at 390.)[7] At that appointment, Leslie explained her

12 history of anxiety and depression and "explain[ed] also that she has secondary

13 Fibromyalgia with symptoms of chronic muscle aches, muscle sensitivity, chronic sleep

14 disturbance, and fatigue." (Id.) Additionally, after Leslie's physical examination Dr.

15 Chung noted that Leslie was "comfortably seated [and] in no acute distress," and that

16 she "ha[d] full range of motion of her shoulders elbows and wrists . . . . [and] no joint

17 swelling or pain." (Id. at 392.) Dr. Chung "counseled [Leslie] on the importance of

18 treatment and counseling for her Major Depression in order to derive benefit also in her

19 Fibromyalgia symptoms." (Id.) Leslie saw Dr. Chung again on November 28, 2012, at

20 which time Dr. Chung's assessment was largely unchanged. (Id.) At that appointment,

21

22 _____

23 [5]While there is no description of this paperwork, it appears that this paperwork was the Physician's Statement Leslie submitted as part of her initial LTD Application shortly thereafter.

24 [6]The Doctor only signed the medical notes as "Dr. G" however, as there are four doctors at the FMAN, only one of whom's last name begins with G, the Court infers this refers to Dr. Gagneja. (See id. at 125.)

25

26 [7]Dr. Chung noted, "she begins by stating that she has a history of severe Major Depression ever since she was a child. She states that she was abused as a child and does not wish to go into details today. She states that she previously worked at a homeless shelter with 18-21 year-olds and experienced post-traumatic stress disorder from encounters with violent clients and a death threat sent to herself as well as staff April of this year. She has since had episodes of anxiety and panic alternating with worsening depression." (Id. at 390.)

27

28

1   Dr. Chung started Leslie on an experimental use of low-doses of Naltrexone "[f]or

2   specifically her fibromyalgia symptoms of muscle aches and pains."  (Id. at 389.)

3          Leslie saw Dr. Chung again on February 18, 2013.  (Id. at 260-63.)  At that

4   appointment Dr. Chung noted that Leslie was "being actively treated for Fibromyalgia

5   with symptoms of chronic muscle aches, muscle sensitivity, chronic sleep disturbance,

6   and fatigue . . . . [and Leslie] noted ongoing tenderness of the anterior chest wall." (Id.

7   at 260.)  Because of her loss of insurance, Leslie "weaned herself off Effexor gradually,

8   and initiated Amitriptyline . . . for Fibromyalgia."  (Id.)  Leslie also stated that she

9   "continue[d] to have increased muscle aches, tenderness, and a foggy sensorium

10  attributed to the cold weather."  (Id.)  Dr. Chung's notes regarding Leslie's physical

11  examination still described Leslie as "comfortable seated [and] in no acute distress . . .

12  [and that she] ha[d] full range of motion of her shoulders elbows and wrists."  (Id. at

13  262.)  Dr. Chung recommended to continue on with the treatment plan of various

14  exercises to strengthen muscles.  (Id. at 263.)

15  **C. DEFINITIONS UNDER THE LTD PLAN**

16         The LTD Plan under which Plaintiff claimed LTD benefits around the end of

17  September or beginning of October in 2012 contains the following definitions:

18             **Totally Disabled** and **Total Disability** means that as a result of

19             Injury or Sickness You are unable to perform with reasonable

20             continuity the Substantial and Material Acts necessary to pursue

21             Your Usual Occupation and You are not working in Your Usual

22             Occupation.  After a Monthly Benefit has been paid for 24

23             months, You are Totally Disabled when as a result of Injury or

24             Sickness You are not able to engage with reasonable continuity in

25             any occupation in which You could reasonably be expected to

26             perform satisfactorily in light of Your age, education, training,

27             experience, station in life, and physical and mental capacity.

28  (Id. at 51.)

9

**Usual Occupation** means any employment, business, trade or profession and the Substantial and Material Acts of the occupation You were regularly performing for the Policyholder when Disability began.  Usual occupation [sic] is not necessarily limited to the specific job You performed for the Policyholder.

(Id.)

**Substantial and Material Acts** means the important tasks, functions and operations generally required by employers from those engaged in Your Usual Occupation that cannot be reasonably omitted or modified.  In determining what substantial and material acts [sic] are necessary to pursue Your Usual Occupation, We will first look at the specific duties required by Your employer.  If You are unable to perform one or more of these duties with reasonable continuity, We will then determine whether those duties are customarily required of other employees engaged in Your Usual Occupation.  If any specific, material duties required of You by Your employer differ from the material duties customarily required of other employees engaged in your Usual Occupation, then We will not consider those duties in determining what substantial and material acts [sic] are necessary to pursue Your Usual Occupation.

("Substantial and Material Act" or "Substantial and Material") (Id.)

**Pre-existing Conditions** You are not covered for a Disability caused or substantially contributed to by a Pre-existing Condition or medical or surgical treatment of a Pre-existing Condition.  You have a Pre-existing Condition if:

(a) You received medical treatment, care or services for a diagnosed condition or took prescribed medication for a

10

diagnosed condition in the 3 months immediately prior to the

effective date of coverage under this Policy; and

(b) the disability caused or substantially contributed to by the

condition begins in the first 12 months after the effective date

of coverage under this Policy.

(Id. at 33.)

**D.  PLAINTIFF'S INITIAL LTD APPLICATION**

After Leslie terminated her employment with CHC in June 2012, (see id. at 566, 611), she filed her LTD Claim with United around the end of September or beginning of October 2012.  (Id. at 606-10.)  She claimed she was unable to work because of "uncontrolled pain, inability to focus or complete tasks, [and] extreme anxiety.  (Id. at 606.)  She claims her job contributed to her disability because "stress increase[d] [her] symptoms."  (Id. at 606.)

The "Attending Physician's Statement" and "Physician's Statement" portions of the initial LTD Claim, filled out by Dr. McIntosh, listed Major Depression, Recurrent, Acute Stress Disorder, and Fibromyalgia as the Diagnosis.  (Id. at 616-18.)  It noted the primary diagnosis was "Major Depression, Severe" and that "Fibromyalgia" was a secondary condition.  (Id. at 617.)  Regarding restrictions on the patient's movements, Dr. McIntosh wrote that Leslie had no restrictions on things she should not do, and was able to sit, stand, and walk for eight hours in an eight hour workday.  (Id. at 618.)

On January 31, 2013, United wrote to Leslie informing her that her Initial LTD Claim was denied.  (Id. at 328-31.)  Based on the Attending Physician's Statement, United had determined that Major Depression was a pre-existing condition not covered under the LTD Plan.  (Id. at 329.)  United noted that it was not addressing whether her medical records supported her inability to perform the duties of her Occupation because the pre-existing condition was dispositive.  (Id. at 329.)

**E. PLAINTIFF'S APPEAL**

Leslie acknowledges that her depression was a pre-existing condition, and therefore was unable to challenge that aspect of the determination on appeal. She took a different tack.

On February 14, 2013, Leslie emailed United and asked them to "re-review [her] claim" based on new forms and that her primary disabling condition was Fibromyalgia, not depression. (Id. at 309.) She stated she "was not able to have her Rheumatologist fill out the claim paperwork back when the claim was initially filed due to losing [her] Kaiser coverage." (Id. at 309.)

The "new forms" she included were a new version of the "Physician's Statement" portion of the application, this time filled out by Dr. Chung and Dr. Chung's notes from her evaluation of Leslie on January 28, 2013. (Id. at 310-11; 312-15.) On the new forms, Dr. Chung listed Leslie's primary condition as "Fibromyalgia" and her secondary condition as "Chronic Major Depression." (Id. at 310.) Additionally, Dr. Chung indicated that Leslie could only spend one to three hours sitting, standing, and walking in an eight hour work day. (Id. at 311.) The field regarding any restrictions on the patient's movements was left blank. (Id.)

On June 19, 2013, United wrote to Leslie explaining that they had completed the review of her LTD Appeal and were upholding the denial of her claim. (Id. at 105-10.) United explained that Leslie's medical records did "not provide evidence of an impairment precluding work" and that "there [was] no medical support for restrictions and limitations that would prevent [her] from performing the substantial and material acts of [her] usual occupation, [sic] which is light physical strength demand." (Id. at 109.)

**F. THE LAWSUIT**

The appeal presents two principal questions. First, the Court must determine whether United correctly characterized the substantial and material duties of Leslie's occupation. If so, then the Court must determine whether the diagnosis of fibromyalgia

supports Leslie's claim that her medical condition precluded her from performing the Substantial and Material duties of her Occupation.

### III.

### DISCUSSION

**A.  ERISA Standard of Review**

When Congress enacted ERISA, it did so to protect the "interests of participants in employee benefit plans and their beneficiaries."  29 U.S.C. § 1001(b).  To this end, ERISA requires employers and plan administrators to provide participants with certain information about their benefits plans.  It also permits a participant to file a civil action in federal court to challenge a denial of benefits under a benefits plan.  29 U.S.C. 1132(a)(1)(B); Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008).  When presiding over such a cause of action, and reviewing a plan administrator's decision to deny benefits to a participant, a district court applies one of two standards of review:  it either reviews the decision de novo, or for an abuse of discretion.  The default standard of review is de novo.  See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  A court reviews for abuse of discretion where the plan itself provides for it or otherwise grants the administrator discretionary authority to determine a participant's eligibility for benefits.  Metro. Life Ins., 554 U.S. at 111.

Here, Plaintiff asserts and United does not object that the proper standard of review is de novo.  (Plaintiff Mem. at 2; see generally United Mem. and Docket No. 27 [United Reply Mem. ("United Reply")].)  Accordingly, the Court must review the administrative record without deference to determine whether Defendant correctly terminated Plaintiff's LTD benefits.  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006).

"On *de novo* review, a district court may, in conducting its independent evaluation of the evidence in the administrative record, take cognizance of the fact (if it is a fact in the particular case) that a given treating physician has 'a greater opportunity to know and observe the patient' than a physician retained by the plan administrator."

<u>Jebian v. Hewlett-Packard Co. Employees Benefits Organization Income Protection</u> <u>Plan</u>, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003). Here, Leslie had many treating physicians and was not examined by any physician on behalf of United. (<u>Id.</u> at 11-12.) Accordingly, the Court will give deference to each of her treating physicians. However, as the discussion below indicates, the information from her treating physicians provides little support for her arguments.

**B. APPLICATION**

At the outset, it is worth noting that Leslie's treating physicians reversed the diagnosis in the Treating Physician's Statement in response to United's denial of benefits. Dr. McIntosh, who filled out the first such form, identified major depression (a pre-existing condition) as the primary basis for concluding that Leslie was disabled. (<u>Id.</u> at 616-18.) Because of the pre-existing condition limitation, United denied the claim. Then, Leslie obtained a new statement from Dr. Chung who had seen Leslie several times during 2012.

Dr. Chung noted that Leslie had herself described her fibromyalgia as secondary to major depression, and reported that she counseled Leslie "on the importance of treatment and counseling for her Major Depression in order to derive benefit also in her Fibromyalgia symptoms." (<u>Id.</u> at 392.) Again in January 2013, at about the same time that she submitted her Treating Physician's Statement in support of Leslie's appeal of the denial of her benefit, Dr. Chung wrote, "This patient has a history of Major Depression and Post-traumatic stress disorder with ***secondary Fibromyalgia***." (Id. at 315.) Thus, Dr. Chung's Treating Physician's Statement was inconsistent with her contemporaneous treatment notes. The statement specifically identified Leslie's primary condition as "Fibromyalgia" with "Chronic Major Depression" as a secondary symptom when the record is completely devoid of any evidence to support that conclusion. (<u>Id.</u> at 309.) This change in response to the denial of benefits raises questions concerning its reliability and the weight to be given to the revised claim for benefits.

Moreover, Dr. Chung's notes, both before and after she submitted the Treating Physician's Statement based on a January 28, 2013 evaluation, suggested that, with respect to her Fibromyalgia symptoms, Leslie was not in acute distress.  These notes repeatedly indicated that Leslie was comfortably seated, in no acute distress, and with full range of motion in shoulders, elbows and wrists.  (E.g., id. at 392 (Oct. 22, 2012 examination), 389 (November 28, 2012 examination), 262 (Feb. 18, 2013 examination)).  Thus, there are substantial reasons for distrusting the second Treating Physician's Statement submitted in support of Leslie's claim.

### 1. PLAINTIFF CLAIMS THAT HER JOB REQUIRED HEAVY LIFTING

Plaintiff bears the burden of proving entitlement to benefits.  Muniz v. Amec Constr. Mgmt. Inc., 623 F.3d 1290, 1294 (9th Cir. 2010).  To determine whether she has met that burden, the Court must assess the evidence in light of the contract definition of total disability.  Here that means that Leslie must prove that she was disabled from performing "the important tasks, functions and operations generally required by employers from those engaged in Your Usual Occupation that cannot be reasonably omitted or modified" so long as the disability did not result from a pre-existing condition.  With respect to her depression, all concede that it is a pre-existing condition. (Docket No. 28 [Plaintiff Reply Mem. ("Plaintiff Reply")] at 4.)  Thus, the case centers on the allegedly disabling condition of fibromyalgia in light of the policy definition and her job duties.

Leslie essentially contends that the Court need not reach the issue of pre-existing condition because the "important tasks and functions of her job that could not reasonably be omitted or modified" included lifting 40 to 50 pounds.  Because her fibromyalgia precluded her from lifting that much weight, she contends that she is totally disabled.   As explained below, the Court finds that: (1) the ability to lift 40-50 pounds was not a "substantial and material" requirement of Leslie's Occupation and thus is outside the scope of the proper occupational definition; (2) Leslie is not Totally Disabled from performing that the properly defined Occupation; but (3) even if Leslie is

Totally Disabled within the meaning of the policy, her fibromyalgia is a pre-existing condition and her disability is not covered by the policy.

## 2. LIFTING 40-50 POUNDS IS NOT A REQUIREMENT OF LESLIE'S "OCCUPATION"

At the threshold, Plaintiff urges that she "should be given an opportunity to present evidence on the issue of whether or not the [Occupation] identified by [United] is in fact the closest match to her actual occupation." (Plaintiff Reply at 9.) However, having been through two levels of review and briefing for this trial, Plaintiff offers no good reason or any persuasive authority in support of this belated request. Moreover, she does not even proffer any additional evidence that would tend to undermine United's analysis of her Occupational duties. Rather, Plaintiff repeatedly asserts that her job requires lifting 40-50 pounds and that such requirement was impermissibly omitted from her Occupation. (Plaintiff Mem. at 4; Plaintiff Reply at 8-9.) Thus, the Court will assesses whether the purported lifting requirement is an "important task[], function and operation[] generally required by employers from those engaged in" her Occupation.

### a. Job Duties Leslie Listed in Her LTD Application

Leslie's legal position is undermined by her own attempt to obtain LTD benefits. In her initial LTD Application, Leslie did not list lifting 40-50 pounds, occasionally or otherwise, as one of her job duties. (See id. at 608.) Rather, when asked about physical requirements of the job, she listed "lifting boxes" but without indicating any particular weight range. (Id.) Given that she was applying for disability benefits, it is implausible that Leslie would have failed to mention it had she customarily been required to lift such heavy loads in the ordinary course of her duties.

1

### b. Leslie's Employer's Job Description

2

United's exclusion of lifting 40-50 pounds as an "important task, function or

3

operation" of her job is not undermined by the information supplied by Leslie's

4

employer.

5

Leslie's employer provided detailed information regarding Leslie's position as

6

Administrative Services Coordinator/Purchasing and Facilities. (Id. at 612-15.) The

7

position is summarized as follows:

8

Under the supervision of the CFO performs various administrative

9

services functions and takes lead on projects as assigned. The position is
responsible for maintaining confidential information and safeguarding

10

the integrity of CHC's financial data and administrative data systems.
Essential areas of coordination with the CFO and the maintenance staff

11

and completion of tasks include: timely completion of all purchasing

12

tasks; identifies problems with facilities in terms of functioning and
appearance, analyzes potential solutions and plans a strategy for

13

completion of solution as; back up for IT staff on leave to complete basic

14

computer tasks as needed; insures that duties and tasks performed are
compliant with the company's purchasing policies, administrative and

15

accounting policies and procedures.

16

17

(Id. at 614.)

18

19

Under coordination of facilities management, the job description contains 10

20

bullet points that describe the numerous duties encompassed in the purchasing,

21

maintenance and housekeeping functions of the position. (Id.) Other duties include

22

assisting in the maintenance of the time clock system and other information systems,

23

back-up to accounting and payroll on an as needed basis, and support for CFO in

24

maintaining department records and performance of projects. (Id.) Given these duties,

25

the job required a B.A. degree in business management, accounting or a related field

26

and a minimum of 3 to 5 years experience in purchasing, facilities and related positions

27

with preference for additional background in accounting and purchase order cost

28

coding.  (Id. at 615.)  Among other things, the position required strong organizational skills, the ability to set priorities, and proficiency "in all MS Office applications such as Outlook, Word, and Excel."  (Id.)  It also indicates that, "on occasion," the position requires lifting of 40 to 50 pounds."  (Id.)  This was reiterated in information provided by the Human Resources manager who indicated that the administrative services coordinator would have to lift 40 to 50 pounds "(on oc.– not off.)"  (Id. at 613.)

These materials clearly indicate that lifting 40 to 50 pounds was considered a job duty, but because it was described as something required "on occasion" and far outside the bulk of the job duties, the question is whether it constituted a Substantial and Material task associated with the position.  (Id. at 51.) As the disability policy indicates, the insurer looks first to the actual duties required by the employer and then, if the employee cannot perform those duties, assesses whether "those duties are customarily required of other employees engaged in Your Usual Occupation."  (Id. at 51.)   If they are not customarily required of other employees in that position, they are excluded from consideration as a Substantial and Material Act necessary to perform the duties of "Your Usual Occupation."  (Id.)

Given the nature of the job, its broad administrative and managerial duties and responsibilities, and the education and training required to perform the job, heavy lifting appears at best to be an insubstantial and immaterial aspect of the job, and one that could easily be modified to accommodate an otherwise qualified candidate for the position.  The record supports such a conclusion.

### c. United's Vocational Consultant's Analysis

United's vocational consultant's analysis provides substantial evidence that lifting 40-50 pounds was properly excluded as a Substantial and Material task of Leslie's Occupation.  As permitted under the LTD Plan, United had a vocational consultant evaluate Leslie's Occupation to determine whether she was Totally Disabled therefrom.  (Id. at 114-16.)  In determining Leslie's Occupation, the consultant used information provided in Leslie's Initial LTD Application, and several neutral sources

such as the DOT, O*net, and other publications authored by the Department of Labor. The vocational consultant specifically noted the disputed requirement of lifting 40-50 pounds.  (See id. at 116.)  Because of the occasional nature of the activity, the vocational consultant decided it was not a Substantial and Material Act and thus excluded it from Leslie's Occupation.  (Id.)  Instead, the vocational consultant concluded that Leslie's occupation was similar to "building supervisor," and that "this occupation is performed at the light physical demand level." (Id. at 107.)  Accordingly, United concluded that

> there is no medical support for restrictions and limitations that would prevent you from performing the substantial and material acts of your usual occupation, which is light physical strength demand.

(Id. at 109.)

Based on the evidence in the record, the Court is convinced that lifting 40-50 pounds was not a Substantial and Material Act of Leslie's Occupation as it was occasional and could reasonably be omitted.  Thus, United properly omitted such activity from Leslie's Occupation in analyzing whether Leslie was Totally Disabled. Having reached that conclusion, it follows, as discussed below, that Leslie's fibromyalgia does not render her totally disabled within the meaning of the policy.

### 3.  LESLIE IS NOT TOTALLY DISABLED BY HER FIBROMYALGIA

Leslie claims her Fibromyalgia has Totally Disabled her from performing her Occupation.  Based on the weight of the medical evidence, including Dr. McIntosh's Statement, and Dr. Chung's notes, the Court concludes that the clear weight of evidence demonstrates Leslie is not Totally Disabled from her Occupation and that LTD benefits were properly denied.

#### a.  Leslie's Medical Records

The first factor weighing in United's favor is Leslie's medical records.  From 2011 until 2013 Leslie received treatment from multiple physicians.  Though she was first diagnosed with Fibromyalgia during the covered period, no medical records

1   indicate that Leslie had any trouble standing, sitting, or walking or that she was unable

2   to lift at some amount of weight.  Indeed, multiple records of physical examinations

3   note that Leslie was seated comfortably and not in any acute distress.  Furthermore,

4   after losing her Kaiser coverage Leslie weaned herself off a Fibromyalgia treatment

5   drug, supplementing with others, without issue.  Her medical records do reveal

6   complaints of chronic pain, especially in her back and shoulders.  However, to one

7   physician Leslie stated the pain had occurred since a motor vehicle accident in prior

8   years, not because of her Fibromyalgia.  (Id. at 133.)  At the very least, Leslie's medical

9   records do not indicate she was in any acute distress or unmanageable pain from

10  Fibromyalgia.

### b.  Plaintiff's LTD Application & Dr. McIntosh's Physician's Statement

13  Secondly, Dr. McIntosh's statements in the Physician's Statement form part of

14  Leslie's initial LTD Application support United's finding.  In that form Dr. McIntosh,

15  who had been treating Leslie since March 2012, indicated that Leslie had no physical

16  restrictions and was able to sit, stand, and walk for up to eight hours in an eight hour

17  workday.  (See id. at 618.)  Indeed, Dr. McIntosh implied that Leslie's problems were

18  psychiatric and did not require restriction of her physical capabilities.  (Id.)

### c.  Plaintiff's Appeal & Dr. Chung's New Physician's Statement

20  On appeal Leslie submitted a new Physician's Statement form, this time filled

21  out by Dr. Chung, as well as Dr. Chung's notes from her evaluation of Leslie on

22  January 28, 2013.  (Id. at 310-11; 312-15.)  On the Physician's Statement form, Dr.

23  Chung indicated that Leslie could only sit, stand, and walk for one to three hours in an

24  eight hour workday.  (Id. at 311.)  However, she failed to include any restrictions on

25  Leslie's actions.  (Id.)  Additionally, the Physician's Statement stated Leslie's primary

26  condition was Fibromyalgia.  (Id.)

27  However, as discussed above, all of this information is belied by Dr. Chung's

28  own notes from her examination of Leslie on the same day.  (See id. at 312-15.)  In her

1    notes, Dr. Chung writes that Leslie has "secondary Fibromyalgia."  (Id. at 315.)  While

2    Dr. Chung's notes do reflect that Leslie reported "chronic muscle aches, muscle

3    sensitivity, chronic sleep disturbance, and fatigue," she fails to note any discomfort or

4    difficulty Leslie had in sitting, standing, or walking.  (Id.)  Moreover, in Dr. Chung's

5    notes from Leslie's physical examination, Dr. Chung stated Leslie was "comfortably

6    seated in no acute distress."  (Id. at 314.)  Thus the bulk of Dr. Chung's recorded

7    observations demonstrates that Leslie is not disabled.

8         Additionally, it is worth noting that Leslie's claimed reason for not submitting

9    Dr. Chung's paperwork with her initial LTD Application, that she had lost her Kaiser

10   coverage and thus could not have her rheumatologist fill out the requisite paperwork,

11   cannot be squared with what actually occurred.  Despite the lapse of her Kaiser

12   coverage, Leslie did have a Kaiser doctor, Dr. McIntosh, prepare the treating

13   physician's statement.  Leslie has offered no explanation why her Kaiser rheumatologist

14   was any less able to fill out the paperwork than was Dr. McIntosh.  Moreover, at about

15   the time she applied for disability benefits, she made and kept and appointment with Dr.

16   Chung, a rheumatologist at Facey Medical Group.  (Id. at 390.)  Thus, it appears that

17   Leslie could have obtained a statement from the Kaiser rheumatologist and that she

18   could have supplemented her application with a statement from Dr. Chung had she

19   thought it important.

20              ***d. The Work Status Reports Ordering Leslie Off Work***

21        There is some evidence that Leslie is unable to work because of her

22   Fibromyalgia.  Leslie was found not able to work by multiple physicians and ordered

23   off work six times in 2012.  (See id. at 619-24.)  Aiding Leslie's claim that her

24   Fibromyalgia is Totally Disabling, Fibromyalgia was twice listed as the sole cause of

25   such work status reports.  (See id. at 622, 624.)  However, it is telling that the doctor

26   who ordered her off work three times, Dr. McIntosh, did not believe that Leslie was

27   Totally Disabled from her Occupation as evidenced by Dr. McIntosh's Physician's

28   Statement in Leslie's initial LTD Application.  Thus, this evidence does not strongly

1   support Leslie's claim that she is Totally Disabled.

2        Accordingly, the Court finds that the vast weight of the evidence demonstrates

3   that Leslie is not Totally Disabled from her Occupation.

4        **4. LESLIE'S FIBROMYALGIA IS A PRE-EXISTING CONDITION**[8]

5        Finally, even if the Court were to conclude that the OA had improperly assessed

6   Leslie's job duties and that Leslie was Totally Disabled from performing those duties

7   due to Fibromyalgia, it would not change the outcome.  The evidentiary record supports

8   the conclusion that the Fibromyalgia was a pre-existing condition either secondary to

9   her severe clinical depression or independently based on her long-standing complaints

10  of body pain.

11       Leslie began working at CHC in September 2011.  In an August 2011 visit to

12  FMAN, Leslie complained of shoulder and upper back pain although no diagnosis was

13  made at the time.  (Id. at 587.)  In her first visit to a doctor at Kaiser in January 2012,

14  she reported to Dr. Roraldo her history of depression and pain in her neck and

15  shoulders.  (Id. at 133.)  Leslie connected the pain to an automobile accident in June

16  2011.  (Id.)  However, in a visit to Dr. Roraldo in May 2012, she reported that she had

17  endured generalized body pains for at least eight years.  (Id. at 174.)  She was referred

18  for a psychiatric evaluation and was seen by Dr. McIntosh, who considered

19  Fibromyalgia as a possible cause of Leslie's body pains.  (Id. at 544.)  She was then

20  referred to a rheumatologist who took a detailed patient history in which he noted

21  "diffuse body pain (non-neuropathic) began in late teen (19)."  (Id. at 196.)  Thereafter,

22  Leslie's medical records reflect a first diagnosis of Fibromyalgia, which was based on

23  evidence that she had suffered with body pain for years.

24       This evidence strongly supports the conclusion that Fibromyalgia was a pre-

25  existing condition and that resultant disability was excluded from coverage.  Whether it

26  was secondary to her severe depression seems likely from the evidence.  For example,

27

28  [8]As noted above, this issue was not addressed in United's denial of Leslie's appeal.  However, because both parties argue the point, the Court briefly responds to their arguments in this section of its order.

Dr. Chung, a rheumatologist, noted that Leslie had reported her depression and anxiety and "explain[ed] also that she has secondary Fibromyalgia . . . ." (Id. at 390.) Dr. Chung noted that he counseled Leslie on the importance of treating her depression "in order to derive benefit also in her Fibromyalgia symptoms. (Id.) Dr. Tang noted that Leslie had suffered from depression from at least the age of 10 and that she had developed the Fibromyalgia symptoms in her late teens. (Id. at 196.) Thus, although the genesis of the Fibromyalgia is ultimately not material to the outcome, the evidence shows that the symptoms were present for many years before her work at CHC and appeared to be an outgrowth of the major depression. Because her Fibromyalgia, which her revised treating physician's statement indicates is the cause of her disability, was a pre-existing condition, United properly denied the application for benefits.

## C. CONCLUSION

The weight of the evidence indicates that lifting 40-50 pounds was not a Substantial and Material Act that was required in Leslie's Occupation under the LTD Plan, and thus, the Occupation that United used in evaluating Leslie's claim was proper. Additionally, the weight of the medical evidence indicates that Leslie is not Totally Disabled from performing her Occupation by her Fibromyalgia. Leslie has therefore failed to meet her burden of proving that she is Totally Disabled under the policy. Finally, the evidence supports the conclusion that Leslie's Fibromyalgia was a pre-existing condition within the meaning of the policy.

//

//

//

//

//

//

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.**

**CONCLUSION**

Based on the reasoning given above, the Court finds in favor of United and **ORDERS** United to submit a proposed final judgment consistent with this order by the close of business on **November 5, 2014**.

**IT IS SO ORDERED.**

Dated:  October 27, 2014

_____
Gary Allen Feess
United States District Judge